# STATE OF MICHIGAN

# COURT OF APPEALS

APOSTOLOS PAUL MARGARIS,

Plaintiff-Appellant,

v

GENESEE COUNTY, CHRISTOPHER
SWANSON, and SHERIFF ROBERT PICKELL,

Defendants-Appellees,

and

STARLITE DINER, INC., and KOSTA POPOFF,

Defendants.

FOR PUBLICATION
May 3, 2018
9:00 a.m.

No. 337771
Genesee Circuit Court
LC No. 15-105802-CZ

Before: SERVITTO, P.J., and MARKEY and O'CONNELL, JJ.

PER CURIAM.

Plaintiff appeals by right the trial court's grant of summary disposition in favor of defendants, Genesee County, Sheriff Robert Pickell, and Undersheriff Christopher Swanson, pursuant to MCR 2.116(C)(7) (claim barred by immunity), MCR 2.116(C)(8) (failure to state a claim), and MCR 2.116(C)(10) (no genuine issue of material fact). The trial court ruled that governmental immunity applied because Pickell was acting in his capacity as the sheriff at all times, and Swanson was acting within the bounds of his authority. The trial court further concluded that defendant Kosta Popoff, owner of the Starlite Diner, Inc., was a victim under the circumstances and acted with good character in trying to resolve a conflict.[1] We affirm.

---

[1] Although the trial court granted summary disposition to defendants Starlite and Popoff pursuant to MCR 2.116(C)(8) (failure to state a claim), and MCR 2.116(C)(10) (no genuine issue of material fact), the parties had stipulated to dismiss the claims against Popoff and Starlite after the motion hearing and before the trial court's opinion and order was entered.

Plaintiff was the owner of another restaurant. An employee at Starlite informed Popoff that one of plaintiff's intermittent employees, Mike Jacques, who used to work for Starlite, was stealing meat from Starlite and selling it to plaintiff. Popoff informed Pickell. Pickell's department investigated and performed a sting operation in which plaintiff purchased three boxes of meat that were supplied to Jacques by Popoff. After plaintiff's arrest, Swanson facilitated an agreement for plaintiff to pay $1,800 in restitution, and the case would not be prosecuted. Plaintiff filed claims alleging that defendants committed fraud by misrepresenting facts in order to extort money from plaintiff and for intentional infliction of emotional distress, conversion, discrimination, harassment, and civil conspiracy.

Plaintiff argues on appeal that the trial court erred by granting summary disposition pursuant to MCR 2.116(C)(7) because Pickell's actions were not within the scope of his executive authority, and Swanson acted in bad faith. We disagree.

This Court reviews de novo the applicability of governmental immunity as a question of law. *Herman v Detroit*, 261 Mich App 141, 143; 680 NW2d 71 (2004). In reviewing a motion for summary disposition based on immunity, MCR 2.116(C)(7), this Court considers the affidavits, depositions, admissions, and other documentary evidence to determine whether movant is entitled to immunity as a matter of law. *Tarlea v Crabtree*, 263 Mich App 80, 87; 687 NW2d 333 (2004). The evidence is viewed in a "light most favorable to the nonmoving party," and "all legitimate inferences in favor of the nonmoving party" are drawn. *Jackson v Saginaw Co*, 458 Mich 141, 142; 580 NW2d 870 (1998).

Governmental immunity from tort liability is governed by the operation of MCL 691.1407. Under § 7, immunity is broadly interpreted, and exceptions to it are narrowly construed. *Frohriep v Flanagan*, 275 Mich App 456, 468; 739 NW2d 645 (2007), rev'd in part on other grounds 480 Mich 962 (2007). Governmental immunity is a characteristic of government, and plaintiffs bringing suit against the government must plead to avoid the government's immunity. *Odom v Wayne Co*, 482 Mich 459, 478-479; 760 NW2d 217 (2008).

## I. SHERIFF PICKELL

When a defendant invokes individual governmental immunity, the court must first determine whether the individual is entitled to absolute immunity as a high level executive official under MCL 691.1407(5). High level executive officials "may qualify for absolute immunity because they have broad-based jurisdiction or extensive authority similar to that of a judge or legislator." *Harrison v Director of Dep't of Corrections*, 194 Mich App 446, 451; 487 NW2d 799 (1992). To benefit from the immunity granted to highly ranked officials, an individual must be a judge, a legislator, or the highest executive official in the level of government in which he is employed. See *Eichhorn v Lamphere School Dist*, 166 Mich App 527, 538; 421 NW2d 230 (1988). Here, Pickell was the sheriff of Genesee County. A county sheriff is entitled to high-level governmental immunity. See *Bennett v Detroit Police Chief*, 274 Mich App 307, 313-314; 732 NW2d 164 (2006) (concluding that the chief of police was entitled to governmental immunity). The sheriff is the highest elected official and executive officer of the county's law enforcement. See Const 1963, art 7, § 4. Because the allegations against Pickell involved his acting in his capacity as sheriff, he is entitled to absolute immunity if he was acting within the scope of his executive authority.

Whether the highest executive official of local government was acting within his authority depends on a number of factors, including the "nature of the specific acts," the "position held by the official," the "local law defining the official's authority," and the "structure and allocation of powers in the particular level of government." *Bennett*, 274 Mich App at 312 (citation omitted). Here, plaintiff argues that Pickell was not acting within his authority because he was acting as a debt collector for a private citizen and his political supporter, Popoff, rather than serving a law enforcement function. But there was no evidence of an intentional transaction between Popoff and plaintiff for which plaintiff incurred a debt to be collected.

MCL 51.76(2)(b) provides that the sheriff is responsible in part for "[e]nforcing the criminal laws of this state, violations of which are observed by or brought to the attention of the sheriff's department while providing the patrolling and monitoring required by this subsection." Here, Pickell was dining at the restaurant belonging to his friend and political supporter, Popoff, when Popoff informed him that he learned that an ex-employee had been selling plaintiff meat stolen from his restaurant. Pickell directed Swanson to investigate. He did so by interviewing those involved and by the sheriff's department initiating an undercover operation where Jacques sold meat from Popoff to plaintiff.[2] Plaintiff was arrested after buying the meat from Jacques. The investigating officer, William Lanning, spoke to the assistant prosecutor, Timothy Bograkos, to request an arrest warrant, and Bograkos spoke to the county prosecutor, David Leyton. Pickell and Swanson met with Leyton to request resolution of the case through restitution instead of prosecution, as Popoff favored restitution. Swanson met with plaintiff, and they reached an agreement in which plaintiff paid $1,800 to Popoff, and Popoff would not seek prosecution.

Thus, Pickell's activities of receiving information about a theft crime, conducting an investigation, suggesting restitution rather than prosecution, and authorizing Swanson to speak with plaintiff about restitution were in the framework of investigating crimes and enforcing the law in Genesee County, all of which were his responsibilities as sheriff. Because Pickell was acting in the scope of his executive authority as sheriff, he was entitled to immunity.

Plaintiff argues that the sheriff's department was collecting a debt from plaintiff, and debt collection was not within the executive authority of Pickell. Pickell characterized the resolution of the matter as plaintiff's paying restitution for a wrongdoing, not satisfying a debt for money owed. The sheriff's department had experience at resolving complaints through restitution whether through its consumer's protection bureau for consumer issues or after investigating criminal matters. Pickell believed that it was the right of the sheriff to attempt to settle a dispute and perhaps avoid prosecution. Leyton believed that it was proper for the victim of a crime to settle the case through restitution and that Swanson had assisted with resolving other cases similarly. Bograkos said it was common to resolve a case such as this with restitution. Popoff said that after the sheriff's department asked him about resolving the situation, his attorney told him that the police frequently used a civil remedy to work out a complaint. Popoff recalled that the local police previously worked out restitution, rather than prosecution, for a person who

---

[2] According to Swanson, Jacques admitting he stole steaks from Starlite and sold 10 boxes of them to plaintiff more than four times.

vandalized his restaurant. Popoff said that he did not wish to harm plaintiff or his business, but he did wish to receive restitution for the meat that was stolen.

Plaintiff argues that the money that plaintiff paid could not have been restitution because Pickell and Swanson knew that plaintiff was not going to be prosecuted before plaintiff agreed to pay the money. Plaintiff states that Pickell and Swanson knew that plaintiff was not going to be prosecuted because former County Commissioner Jamie Curtis stated that she heard Leyton report that he told Pickell and Swanson that he would not prosecute plaintiff because the case involved only the theft of $75 worth of meat, a misdemeanor.

Other facts of record, however, provide more insight into the comments Curtis heard. Leyton did not recall a conversation about the value of the meat or whether the crime was a misdemeanor, and he did not recall discussing the case with Curtis. The Curtis affidavit also states that she heard Leyton say that he did not know about prosecuting plaintiff because he knew both plaintiff and Popoff. Leyton said that Bograkos informed him that a warrant was requested stemming from plaintiff's buying stolen meat, and Leyton said that the case would have to be transferred to another agency if it were prosecuted because he knew plaintiff and Popoff. Similarly, Bograkos said Lanning presented the case to him for warrant review, and he spoke to Leyton, who requested a dollar amount of the meat involved so that he could determine which agency to refer the case to because he was going to have to recuse his office. Bograkos believed that there was probable cause to authorize a warrant before the case was resolved.

Pickell reported that Popoff told him that he had common friends with plaintiff because he was Greek and did not wish to see plaintiff's business harmed by a prosecution. Consequently, Pickell thought it was appropriate to treat the situation like a consumer protection matter so Popoff could get his money back. Pickell and Swanson reported that they met with Leyton, who approved the reimbursement remedy rather than prosecution. Leyton said that he met with Pickell and Swanson, who wished to refer the case to the consumer protection division, which Leyton approved. Thus, the evidence, considered in a light most favorable to plaintiff, indicated that plaintiff's prosecution was deferred in an attempt to resolve the situation through restitution.

The Sheriff's Department report stated that plaintiff had been arrested for larceny and receiving and concealing stolen property but that plaintiff and Popoff agreed to a $1,800 settlement and a promise not to pursue criminal or civil action. After the agreement was reached, Bograkos denied the warrant because the case had been resolved. The warrant request stated that a warrant was denied by the prosecutor because the "parties have resolved their differences and reached a restitution agreement." There was no evidence that prosecution had been dismissed as a possibility before the situation was resolved through the settlement.

Plaintiff also argues that he could not have been guilty of a crime because he did not know the meat was stolen. Plaintiff reported that Jacques told him on a previous occasion that the meat was from his friend at Cisco Foods. He further stated that he did not know where the meat was from that he purchased the day he was arrested because he did not look at the boxes, which had Starlite mailing labels on them, before he put them in the freezer. The trial court acknowledged that it was possible that plaintiff did not know the meat was stolen. However, plaintiff reported that he and his wife discussed that Jacques used to work at Starlite and that he

agreed with his wife that the meat could have been taken from Starlite. Plaintiff explained that his wife attempted to call Starlite to discuss the matter, but she was unable to speak with Popoff. Plaintiff testified that he apologized to Lanning for having purchased stolen meat and that he made a big mistake. Swanson reported that Jacques said "enjoy the Starlite special" after selling the stolen meat to plaintiff. Notably, rather than undergo prosecution and allow a jury to determine whether plaintiff knew he was buying stolen meat, plaintiff agreed to pay an amount of restitution. Considering the evidence in a light that favors plaintiff, we agree it was possible for a jury to determine that plaintiff had committed a crime had plaintiff chosen to decline restitution.

Plaintiff argues that the value of the meat was only $75, so plaintiff's payment of $1,800 was too excessive to be considered restitution for an amount that would have been a misdemeanor. But the actual value of the meat that had been stolen from Popoff and which plaintiff purchased was not definitively established. Plaintiff reported that on the day of his arrest he bought two boxes of steaks and one of turkey, for a total of $75. Popoff said the total value of the three boxes of meat he provided for the undercover operation was $350. Additionally, Jacques stated that he had sold three boxes of meat stolen from Popoff to plaintiff earlier for $275. Plaintiff told Lanning that approximately a month before his arrest he purchased four or five boxes of steak for $40 a box. When he was arrested, plaintiff provided Lanning with four cases of meat from his freezer that he had purchased from Jacques.

According to Popoff, his informant thought that plaintiff purchased the stolen meat on four or five occasions. Popoff estimated from information from his manager and prep cook that the stolen food was worth between $500 and $1,000 for each instance, or a total of $4,000 to $10,000. Swanson thought that the value of the meat, according to Popoff's report, was "into the thousands," as high as $10,000, but that amount could not be demonstrated. Pickell stated that he was not involved in determining the amount of restitution. Bograkos said that he never learned of a specific dollar amount. Thus, the $75 figure was the black market value of the meat stolen during the sting operation; it had a much higher market value. Additionally, there were additional purchases of stolen meat with varying black market and retail values. But, in sum, it is disingenuous to suggest that plaintiff paid $1,800 for $75 worth of meat or that the case would not have been prosecuted due to the amount plaintiff paid for his most recent purchase.

## II. UNDERSHERIFF SWANSON

Plaintiff next argues that the trial court erred by ruling that Swanson was entitled to individual governmental immunity. In respect to an intentional tort, lower level governmental employees can demonstrate entitlement to individual governmental immunity by showing the following:

(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

(b) the acts were undertaken in good faith, or were not undertaken with malice, and

> (c) the acts were discretionary, as opposed to ministerial. [*Odom*, 482 Mich at 480.]

The commission of an intentional tort is not the exercise or discharge of a governmental function. *Moore v Detroit*, 128 Mich App 491, 497; 340 NW2d 640 (1983).

As discussed above, investigating the criminal activity of purchasing stolen meat from Starlite and Popoff and resolving the investigation with the payment of restitution was within Swanson's authority. Plaintiff does not argue that resolving the case with restitution was a ministerial task. Plaintiff argues that Swanson did not act in good faith when speaking with plaintiff about restitution. Plaintiff recalled that he invited Swanson to speak with him at his restaurant, and Swanson told him that Starlite could not wait for him to not agree to pay a settlement. According to plaintiff, Swanson said that Starlite wanted to "bury" him, so that he "will never see the daylight," and that he was facing prison time and "he" knows the judges, the sheriff, and the prosecutor. Plaintiff said that Swanson asked him to pay $5,000 to make the incident go away, but plaintiff refused. Plaintiff reported that Swanson then called Popoff and lowered the requested amount to $3,000, after which plaintiff offered, or agreed to, the $1,800 that was accepted. Plaintiff said that after he paid the money, Swanson told him that the owner of Starlite did not want to hurt him. Plaintiff recalled that he signed a receipt that Popoff also signed documenting the transaction.

By contrast, Swanson denied that he threatened plaintiff with prison during their conversation, characterizing it as cordial and factual. He said he informed plaintiff that Popoff did not wish to prosecute; he wanted to resolve the case with restitution. Swanson said that he did not recall what amounts were discussed, other than plaintiff's offering $1,500, but he knew that the lowest amount that Popoff would accept was $1,800. Popoff stated that $1,800 was his settlement amount because plaintiff had $600 worth of Popoff's steaks in his freezer, and his attorney told him that he could seek treble damages. Popoff recalled Swanson's informing him of plaintiff's $1,500 offer, which he declined. Swanson reported that plaintiff provided cash that he documented and gave to Popoff. Popoff reported that he collected the $1,800 from the Sheriff's Department.

Plaintiff argues that Swanson was not acting in good faith to demand $5,000 for $75 of meat and while threatening jail time when he knew that the case would not be prosecuted. But as discussed above, the decision to decline an arrest warrant was made after the restitution payment because the parties had agreed on restitution. Until the case was resolved with restitution, the status of plaintiff's prosecution was not determined, and Swanson could fairly inform plaintiff that prosecution was a possibility. Further, as discussed, no value of the meat stolen was definitively determined. Thus, the potential amount of restitution varied during negotiations, but Popoff ultimately determined a dollar figure to which plaintiff agreed. The evidence indicated that Popoff and his attorney together determined the restitution amount. Plaintiff agreed then agreed to that amount; it was not based on Swanson's actions.

## III. GENESEE COUNTY

Plaintiff also argues that the trial court erred by ruling that Genesee County was entitled to governmental immunity. The governmental tort liability act (GTLA), MCL 691.1401 *et seq.*,

grants immunity from tort liability to the state, as well its agencies, when they are engaged in the exercise of a governmental function, except where the Legislature has expressly granted an exception. MCL 691.1407(1).[3] In this case, Genesee County was not engaged in any of the functions that are exempted from immunity. Therefore, Genesee County was immune from liability because there is no statutory exception applicable to the instant facts, and plaintiff did not plead facts in avoidance of immunity. *Odom*, 482 Mich at 478-480.

Plaintiff argues that Genesee County was not engaged in a governmental function when it was collecting a debt for Popoff from plaintiff. "In determining whether a particular activity constitutes a governmental function, the focus is on the precise activity giving rise to plaintiff's claim rather than on the entity's overall or principal operation." *Everett v Saginaw Co*, 123 Mich App 411, 414; 333 NW2d 301 (1983). Nonetheless, "to use anything other than the general activity standard would all but subvert the broad grant of governmental immunity intended by the Legislature [because i]t would be difficult to characterize any tortious act that is a governmental function." *Payton v Detroit*, 211 Mich App 375, 392; 536 NW2d 233 (1995) (quotation marks and citation omitted). Governmental immunity is differentiated from the immunity given to individuals in that the immunity granted by the GTLA to a governmental entity is based upon the general nature of the activity of its employees, rather than the specific conduct of its employees. *Id*. at 392. Thus, "[t]o determine whether a governmental agency is engaged in a governmental function, the focus must be on the general activity, not the specific conduct involved at the time of the tort." *Pardon v Finkel*, 213 Mich App 643, 649; 540 NW2d 774 (1995). In this case, Genesee County was engaged in the governmental function of law enforcement, and, as discussed, the activity of law enforcement includes investigating suspected crimes and resolving those investigations. Additionally, governmental entities are immune from liability for the torts of its employees when they are engaged in the exercise of a governmental function, except where the Legislature has expressly granted an exception to immunity. Although "there is no exception in the governmental immunity statute for intentional torts[,]" *Payton*, 211 Mich App at 392, as discussed above, Genesee County was engaged in a governmental function at the time of the alleged intentional torts of its employees. See *id*. at 393 (concluding that a governmental unit was entitled to immunity "because it cannot be held liable for the intentional torts of its employees").

## IV. CONCLUSION

Because we conclude that the trial court did not err by granting summary disposition to Pickell, Swanson, and Genesee County pursuant to MCR 2.116(C)(7) as they were entitled to

---

[3] "The statutory exceptions to the governmental immunity provided to the state and its agencies are the highway exception, MCL 691.1402; the motor-vehicle exception, MCL 691.1405; the public-building exception, MCL 691.1406; the proprietary-function exception, MCL 691.1413; the governmental-hospital exception, MCL 691.1407(4); and the sewage-disposal-system-event exception, MCL 691.1417(2) and (3)." *Odom*, 482 Mich at 478 n 62.

governmental immunity, we do not reach the issue of whether the trial court also properly granted summary disposition pursuant to MCR 2.116(C)(8).

We affirm.

/s/ Deborah A. Servitto
/s/ Jane E. Markey