*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHELLY GREEN and JAMES GREEN,

UNPUBLISHED
November 22, 2022

Plaintiffs-Appellants,

v

No. 358555
Macomb Circuit Court
LC No. 2019-005245-NO

MACOMB COMMUNITY COLLEGE,

Defendant-Appellee.

Before: GLEICHER, C.J., and SERVITTO and YATES, JJ.

PER CURIAM.

Shelly Green was injured when she tripped over a "cord bridge" at a private event held at the Sports & Expo Center at Macomb Community College (MCC). The circuit court summarily dismissed Green's premises liability action on governmental immunity grounds. Green contends that the circuit court erroneously concluded that this case did not fall within the proprietary function exception to governmental immunity. We affirm.

## I. BACKGROUND

On April 3, 2019, Shelly Green attended the Michigan Defense Expo at the Sports & Expo Center on MCC's South Campus. Green and her husband, James Green, own a manufacturing company that provides parts and components for defense industry vehicles. They install and operate a display annually at the Michigan Defense Expo. On the day in question, Green "tripped over a plastic cover placed over several electrical cords" as she approached her display area. An MCC employee had placed a warning sign over the cord cover, but someone had moved it prior to Green's fall.

Green filed a premises liability action against MCC. It is undisputed that MCC is a governmental agency and Green predicted that it would raise immunity to avoid the suit. Accordingly, Green alleged in her complaint that MCC "rents the Expo Center to many public and private entities, associations, and organizations in the pursuit of profit, going as far as to contract with a number of vendors, such as catering companies, to further attract business to the Expo Center," placing this case within the proprietary function exception to governmental immunity. Green noted that

-1-

52. For the eleven months ending on May 31, 2019, [MCC's] general fund had an operating surplus of $34,283,781.00 and experienced a $28,061,879.00 increase in net assets.

53. From July 23, 2018 to June 25, 2019, Expo Center leasing operations contributed nearly $600,000.00 toward MCC's revenue stream.

54. . . . this revenue stream contributes directly to MCC's general fund.

When a private group rents the space, it is required to arrange all catering and food services through MCC. In relation to this event, the Michigan National Defense Industrial Association paid a $15,000 rental fee, $9,971.50 in ancillary services, and $6,500 for catering services for the April 2019 Michigan Defense Expo. This was a private event that students were not invited to attend. Green concluded that "[a]s the activity was conducted to allow [MCC] to make a profit, it was thus engaged in a proprietary function," an exception to governmental tort immunity.[1]

MCC ultimately sought summary disposition on governmental immunity grounds and argued that its actions did not fall within the proprietary function exception to immunity.[2] MCC contended that the primary purposes of the Sports & Expo Center were to house college athletics and physical education programs and to give office space to the faculty and staff involved in those programs, not to generate a profit. MCC emphasized that these functions accounted for 85% of the building's use, while private events accounted for only 7%. MCC also presented evidence that these private rentals did not generate enough income to run the center, let alone any other college-related activities. Rather, taxes, state appropriations, and tuition covered the cost of running the center.

MCC presented an affidavit and deposition testimony from John Gerard Cunningham, manager of the Sports & Expo Center. Cunningham asserted that the Expo Center "houses classrooms and offices for faculty, coaches and staff members." It is "the main sports venue for [MCC] indoor sports teams including the Basketball and Volleyball teams." It is used for team practices, intercollegiate sports, and physical education classes. Cunningham continued that the Expo center "provides a venue for academic and community events. These events include [MCC] events, [MCC] co-sponsored events and community events independent of the college." Only the third category is charged a licensing fee to use the space. Cunningham broke down the use of the center in 2019 as follows: Athletics 50% (1,129 uses); Academic 35% (795 uses); Internal and Co-Sponsored Events 7% (169 uses); External Rentals 7% (148 uses). At his deposition, Cunningham asserted that events "typically happen" on the weekends and in 2019, approximately 37% of those weekend events were booked by external clients. Regarding the subject defense industry event,

---

[1] Green also raised a Freedom of Information Act claim in her complaint, but the parties stipulated to the dismissal of that count.

[2] In the alternative MCC contended that Green failed to plead her negligence claim in avoidance of the open and obvious doctrine, warranting dismissal under MCR 2.116(C)(10). The circuit court did not reach that issue as it resolved the summary disposition motion on governmental immunity grounds.

Cunningham asserted that the client was charged $15,000 to use the facility, and that the event "was open to members of the National Defense Industry Association and its guests," not to students or members of the general public.

Cunningham testified that the funds he collects "go[] to the college coffers." MCC's Vice President of Business Elizabeth Argiri presented an affidavit attesting that MCC "is funded primarily by tuition and fees, local property tax revenues, and state appropriations." Argiri prepared a five-year financial analysis of the Sports & Expo Center, from fiscal year 2014-2015 though fiscal year 2019-2020. Argiri calculated that the direct expenses associated with the operation and maintenance of the center "exceeded Revenues from Tuition and Fees, Rentals and Concessions by a range of $659,000 to $844,000 annually." When combined with allocated expenses (covering items like utilities, insurance, support services, custodial, and banking/finance), the expenses exceeded revenues by more than $2 million annually. As a result, revenue from tuition and fees, rentals and concessions "defray only a small portion of the Direct and Allocated costs to operate and maintain the Sports [&] Expo Center" and the center does "not produce a pecuniary profit for the [MCC]." Rather, "[t]he expenses associated with operation and maintenance of the Sports [&] Expo Center are supported by property taxes, state appropriations and user fees (tuition)," not rentals for private events.

Also presented into evidence was a spreadsheet of "revenue" from events held at the Expo Center. From July 2018 through June 25, 2019, event revenues totaled $578,923.51. Another spreadsheet showing allocated budgets for line items connected to the center showed unused budget allocations of $206,811.42 that were "available" in the general fund.

Green retorted that the accumulated evidence demonstrated that 50% of the Sports & Expo Center's revenue (nearly $600,000) comes from private events and that those funds were paid into MCC's general fund to cover other costs, squarely placing this case in the proprietary function exception to governmental immunity. Green criticized MCC's focus on the "purpose" of the Sports & Expo Center as a whole rather than evaluating the "activity that is conducted" in considering whether the purpose was to produce a profit. And Green cited inconsistencies in MCC's evidence that created a question of fact. Specifically, Cunningham stated in his affidavit that the center was used for outside events only 7% of the time, but raised that number to 37% at his deposition.

The circuit court granted MCC's summary disposition motion on governmental immunity grounds. After quoting the definition of proprietary function in MCL 691.1413, the court outlined the test for determining whether an activity is a proprietary function. In doing so, the circuit court recited that courts must "look to the general activity involved rather than the specific conduct engaged in" when considering the applicability of this exception. The court further noted that the exception "does not penalize a governmental agency's legitimate desire to conduct an activity on a self-sustaining basis." The court reasoned that MCC's operation of the Sports & Expo Center was not a proprietary function as follows:

> In the instant mater, the general activity at issue is [MCC's] operation of the Sports & Expo Center. The Usage Guidelines for [the] Sports & Expo Center stated the "primary purpose of the facility is the support of the higher education goals of the College".

John Gerard Cunningham's affidavit states he manages the Sports & Expo Center. The Sports & Expo Center houses classroom and faculty offices, provides the main sports venue for indoor sports teams, is used for team practices and physical education courses, and provides a venue for academic and community events. A licensing fee is charged for independent community event rentals, which comprised only [7%] of the usage of the Sports & Expo Center in 2019.

Elizabeth Argiri is [MCC's] vice president for business. Her affidavit states "[MCC] [including the Sports & Expo Center] is funded primarily by tuition and fees, local property tax revenues, and state appropriations". She prepared a five-year Fiscal Analysis of the Sports & Expo Center that showed operation and maintenance expenses exceeded revenue (including rental and concession fees) for each academic year; revenue (including rental and concession fees) from the Sports & Expo Center did not produce a profit for [MCC].

Therefore, [MCC] clearly does not operate the Sports & Expo Center for the primary purpose of generating a pecuniary profit. Operation of the Sports & Expo Center is supported by taxes and fees.

Consequently, the proprietary function exception to governmental immunity does not apply.

Green now appeals.

## II. LEGAL PRINCIPLES

Summary disposition based on governmental immunity is supported under MCR 2.116(C)(7). We review de novo a circuit court's determination that governmental immunity bars a suit. *Champine v Dep't of Transp*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 161683), slip op at 4. We must consider the evidence presented in the light most favorable to the nonmoving party to determine if "the movant is entitled to immunity as a matter of law." *Margaris v Genesee Co*, 324 Mich App 111, 115; 919 NW2d 659 (2018).

The Governmental Tort Liability Act (GTLA), MCL 691.1401 *et seq.*, immunizes governmental agencies from tort liability if "engaged in the exercise or discharge of a governmental function." MCL 691.1407(1). The act broadly confers immunity to governmental agencies. However, the act includes six exceptions, which must be narrowly construed. *Yono v Dep't of Transp*, 499 Mich 636, 646; 885 NW2d 445 (2016).

One such exception to immunity is when the governmental agency is involved in a proprietary function. MCL 691.1413 provides:

The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees. . . .

Proprietary functions are exempted from governmental immunity because they are the antithesis of governmental functions; "the proprietary function exception means that an activity is not a governmental function because the primary motive is to make a profit and is one not normally supported by taxes and fees." *Harris v Univ of Mich Bd of Regents*, 219 Mich App 679, 691-692; 558 NW2d 225 (1996).

To fall within the definition of "proprietary function," "[t]wo tests must be satisfied: The activity (1) must be conducted primarily for the purpose of producing a pecuniary profit, and (2) it cannot be normally supported by taxes and fees." *Coleman v Kootsillas*, 456 Mich 615, 621; 575 NW2d 527 (1998). In determining if the governmental agency's "primary purpose [was] to produce a pecuniary profit," a court must further consider (1) "whether a profit is actually generated," and (2) "where the profit generated by the activity is deposited and how it is spent." *Id*. (quotation marks omitted).

> The fact that a governmental agency pursues an activity despite consistent losses may be evidence that the primary purpose is not to make a pecuniary profit, but it is not conclusive evidence. Conversely, the fact that the activity consistently generates a profit may evidence an intent to produce a profit.

> \* \* \*

> If the profit is deposited in the governmental agency's general fund or used to finance unrelated functions, this could indicate that the activity at issue was intended to be a general revenue-raising device. If the revenue is used only to pay current and long-range expenses involved in operating the activity, this could indicate that the primary purpose of the activity was not to produce a pecuniary profit. [*Id*. at 621 (cleaned up).]

## III. ANALYSIS

The circuit court correctly determined that MCC was not engaged in a proprietary function and therefore was entitled to governmental immunity.

A point of contention between the parties is the delineation of the "activity" underlying the proprietary function analysis. Green contends that we should look at MCC's act of renting out the Sports & Expo Center while MCC argues the focus should be more generally on the operation of the center.

In summarily dismissing Green's premises liability action, the circuit court relied heavily on the proprietary function analysis in *Elia Cos, LLC v Univ of Mich Regents*, 335 Mich App 439, 448; 966 NW2d 755 (2021), oral argument granted on the application on other grounds ___ Mich ___; 967 NW2d 237 (2021). In *Elia Cos*, the plaintiff filed several tort claims, along with its breach-of-contract claim, when the university terminated its contract to run a coffee shop at the Michigan Student Union. *Id*. at 444-445. In support of its position that the university was not engaged in a governmental function, the plaintiff asserted that the university "leased commercial space in the Union 'for a profit.'" *Id*. at 448. This Court noted that the evidence presented revealed the university "operated the Union at a *consistent loss*," while acknowledging that "operating at a loss is not dispositive." *Id*. Still, the plaintiff urged, the Union was engaged in a

proprietary function because it competed with nearby free-standing restaurants by requiring tenants to remit a percentage of their gross sales and because it used revenue-maximalization factors in setting rents. *Id*. This Court stated that the

> plaintiff's focus is too narrow: courts "look to the general activity involved rather than the specific conduct engaged in" when considering the proprietary-function exception to governmental immunity. *Ward v Mich State Univ (On Remand)*, 287 Mich App 76, 84; 782 NW2d 514 (2010). The general activity at issue is the operation of the Union. [*Elia Cos*, 335 Mich App at 449.]

The general activity involved in this case was the operation of the Sports & Expo Center, just as the general activity in *Elia Cos* was the operation of the student union. MCC made some revenue by renting the center out for private events, just as the University of Michigan made some revenue by renting space out in its student union to private vendors. This minor money-making venture did not change the overall use of the facility. Contrary to Green's argument, MCC did not present inconsistent evidence on this point. Cunningham's affidavit recounted that overall private events were only 7% of the center's use. At his deposition, Cunningham spoke to the weekend use of the center, not its overall use. Accordingly, Cunningham did not contradict himself by testifying that 37% of the center's weekend use went to private events.

Moreover, MCC did not actually make a "profit" by renting out the center for private events; it merely generated "revenue" that was used to off set costs. *Merriam-Webster's Collegiate Dictionary* (11th ed), defines profit, in relevant part, as "1: a valuable return . . . 2: the excess of returns over expenditure in a transactions or series of transactions . . . ." Revenue, on the other hand, is defined in terms of income flowing in. *Id*. *Black's Law Dictionary* (11th ed) makes the distinction even clearer, defining "profit" as "[t]he excess of revenues over expenditures in a business transaction." The evidence reveals that while the costs of private events are covered by the charges paid by the customer, the revenues from these events do not cover the expenditures of running the Sports & Expo Center. For at least the five years leading up to Green's fall, MCC had not made a profit from the center. The funds transferred into MCC's coffers were not profits.

Year after year MCC continued to operate the center at a loss. MCC continued to maintain its sports and physical education programs that comprised a significant majority of the building's use despite that they produced no profit. As a result, according to the financial records produced during discovery, the center was chiefly operated on state appropriations, property tax allocations, and tuition payments.

The evidence, viewed in the light most favorable to Green, demonstrates that MCC was not engaged in a proprietary function, as the operation of the Sports & Expo Center was not "conducted primarily for the purpose of producing a pecuniary profit" and was "normally supported by taxes or fees." Accordingly, the circuit court properly dismissed Green's complaint on governmental immunity grounds.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto
/s/ Christopher P. Yates